UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JEANETTE SCHWARTZ,<br><br>            Plaintiff,<br><br>vs.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and DOES 1 through 20, inclusive,<br><br>            Defendants. | CASE NO.: 2:07-cv-00060-KJD-LRL<br><br>FINDINGS OF FACT<br><br>            AND<br><br>CONCLUSIONS OF LAW |

**INTRODUCTION**

The matter was tried to the Court February 23-24, 2009, Plaintiff, Jeanette Schwartz, appearing by and through her attorney, Ralph Schwartz, Esq., and Defendant, State Farm Mutual Automobile Insurance Company, appearing by and through its attorney, Riley A. Clayton, Esq.. The Court, having considered the testimony and other evidence adduced now makes the following Findings of Fact and Conclusions of Law.

**I.        FINDINGS OF FACT**

1.        This case involves an underinsured motorist claim between Plaintiff, Jeanette Schwartz ("Plaintiff"), and her automobile insurance company, State Farm Mutual Automobile Insurance Company ("State Farm")

2.        State Farm issued a policy of automobile insurance, Policy No. C107574-B25-28B, which policy provided Plaintiff underinsured motorist ("UIM") coverage, subject to all terms, conditions, exclusions, and offsets contained therein (hereinafter the "Policy"). The Policy was in force and effect on July 28, 2005. On that day, the vehicle Plaintiff was driving was rear-ended by another vehicle, resulting in property damage and personal injury to Plaintiff.

3.        At the time of the accident, July 28, 2005, Plaintiff had a severe arthritic condition in both knees. However, she claims that this condition was being successfully treated with steroid

injections, thus minimizing her disability, and that both knees were equally arthritic and troublesome before the accident.[1] Plaintiff argues that because it was the right knee that was injured in the accident, and because that knee became problematic only after the accident, the accident must have been the cause of the need for her right knee replacement. The fact that she did not need replacement of the left knee which was suffering from the same bone-on-bone arthritis as the right, would seem to support the argument that, absent the automobile accident, the right knee also would not have needed replacement. The argument however, contains one or more false premises. The evidence showed that, prior to the accident, it was primarily Plaintiff's right knee that was the source of her complaints and treatment. Plaintiff's medical records show that prior to July 28, 2005, she had experienced significant right knee pain, difficulty in ambulating, and other problems. Specifically, Plaintiff reported pain in her right knee to her treating physicians as early as January and February 2004. On January 16, 2004, Dr. Lindsay T. Hansen, M.D. noted significant pain in the right knee, getting up, standing and certainly kneeling. The medical records of February 27, 2004 reflect that the Plaintiff had "severe and progressive and intolerable right knee pain", worse on the right than on the left.

4. As a result of the pain in her right knee, Plaintiff sought treatment with an orthopedic surgeon, Dr. Todd Swanson, on August 26, 2004. On the day of her initial visit to Dr. Swanson, Plaintiff reported having knee pain of an "8" out of "10" on the pain scale aching, sharp pain and stiffness, swelling and soreness for one year. After examining Plaintiff, Dr. Swanson administered cortisone injections into Plaintiff's right knee and wrote to various individuals concerning the fact that the cortisone injections would attempt to relieve the pain, but that she would eventually need total knee replacement surgery. Cortisone injection provided only temporary relief.

5. Despite receiving the injection from Dr. Swanson, Plaintiff continued to have pain in her right knee. Indeed, medical records within two months of the first injection establish that Plaintiff

---

[1] In her Post-Trial Brief, pp. 8,9, Plaintiff uses the plural "knees" in discussing her knee problems and treatment prior to the accident. This is inconsistent with her deposition testimony which denied problems with the left knee. (See, e.g., pp. 40, 43 and 53 of Plaintiff's Deposition).

2

was having "complaints of fairly significant right knee pain."

6. Plaintiff's symptoms progressively got worse, prompting her to return to Dr. Swanson on April 28, 2005, complaining of bilateral knee pain, right greater than left. Dr. Swanson's records show that he observed a limp relating to Plaintiff's right lower leg, however, Plaintiff denied limping before the accident. Dr. Swanson's records also show and that the x-rays taken in August 2004 revealed near bone on bone arthritis. His assessment of April 28, 2005 is "Bilateral knee degenerative joint disease with the right being more symptomatic than the left." The radiology report of September 25, 2005, two months after the accident, noted "regions of full thickness cartilage loss involving all three compartments." The evidence is clear that such loss of cartilage was degenerative in nature and not the result of any accident. Plaintiff points to diagnosis of pain in the "anterior compartment" after the accident as evidence of a traumatic injury. There is however, no "anterior compartment" of the knee. The three compartments of the knee are the medial, lateral and patellofemoral. There is an anterior horn of the medial meniscus. Where Dr. Swanson notes "tenderness along the right knee, medially and anteriorly", he is not discussing an "anterior compartment". Pain "medially and anteriorly" would be consistent with tears in the medial meniscus extending to the posterior horn and the anterior horn of the medial meniscus as noted on the Radiology Report of September 23, 2005, and also consistent with the pain noted medially in the office visit to Dr. Swanson on April 28, 2005, a full three months before the accident. The fact that pain was first noted anteriorly after the accident, does not necessarily establish that the accident caused any preexisting tear to expand. It is undisputed that the MRI conducted after the accident did not show evidence of acute injury. Additionally, it would be expected that full thickness cartilage loss in some areas would make any remaining cartilage highly susceptible to tear. Dr. Sander's testimony that the August 2004 films revealed that it was "game over" for Plaintiff is consistent with the medical evidence that Plaintiff's need for a right knee replacement was the result of degenerative arthritis and not the automobile accident.

7. During the office visit of April 28, 2005, Dr. Swanson administered another injection to Plaintiff's right knee and instructed her to follow-up in six months (November) or sooner if needed.

3

8.	Plaintiff's testimony on crucial facts concerning the condition of her right knee and her lack of serious disabilities prior to the accident was not credible. Any suggestion that both knees were equally troublesome or that the right knee became problematic only after the accident is not supported by the medical evidence.

9.	On July 28, 2005, Plaintiff was involved in the subject rear-end automobile accident. Plaintiff was not at fault in the accident. The other driver was 100% at fault. Plaintiff denied injury at the time for the stated reason she did not want to go to the hospital. That same day, without seeking medical advice, she decided to accompany her granddaughter, who was also in the vehicle but not injured, on a flight to Denver, Colorado.

10.	Following her return to Las Vegas, Plaintiff initially received some treatment from Dr. Ted Thorp. Importantly, Dr. Thorp's initial evaluation record does not contain any reference in the history that Plaintiff actually struck her knee on the dashboard. During the time that Plaintiff treated with Dr. Thorp, Plaintiff's subjective reports of pain were between "5" to "7" out of "10" on the pain scale.

11.	As noted above, after the accident, Plaintiff underwent an MRI. Although the MRI showed degenerative problems, there was nothing in the MRI to suggest an acute injury. Specifically, there was no "bone bruise" found on the MRI. Had the knee been subjected to significant trauma as a result of the accident, a bone bruise should have been visible in the MRI.

12.	Plaintiff, as part of a scheduled return visit, returned to Dr. Swanson on November 9, 2005. Plaintiff ultimately underwent a right total knee replacement surgery on January 10, 2006.

13.	As a result of the surgery, Plaintiff developed a peroneal nerve palsy. The nerve palsy has become permanent and stationary. The overall result of the nerve palsy is that Plaintiff has a mild motor deficit, e.g., she can't raise her toes on her right foot, and a mild to moderate sensory deficit, e.g., some numbness and coldness in the top portion of the right foot. The right knee replacement surgery was otherwise successful, and helpful in alleviating the problems with her knee relating to the degenerative arthritis.

14.	After the surgery, however, Plaintiff submitted certain information to Medicare

with respect to the payment of the knee surgery and the subsequent treatment. Importantly, Plaintiff was asked to identify whether the injury she sustained and the treatment she received was due to an automobile accident. Question No. 5 on the Determination of Primary Payor for Medicare Beneficiaries questionnaire asked Plaintiff: "Are the services related to an injury due to an automobile accident?" and the box is answered "No." Question No. 7 on the questionnaire asked Plaintiff: "Does the client hold another person or group responsible for the illness/injury for which services are being provided (e.g., auto liability, home owners insurance, medical malpractice)?" and the box is answered "No." Plaintiff argues that she was confused, pointing to a "contradictory" response to Question No. 6 where she also answered "no" to the question of whether the medical services related to a non-auto accident. The answers are entirely consistent if she believed her condition was attributable not to an "accident", but to degenerative arthritis instead.

15.     At some unspecified point, Plaintiff received $10,000.00 from the other driver as a result of the car accident and $5,000.00 in medical payments benefits. Plaintiff then submitted a UIM claim against State Farm.

16.     In connection with the UIM claims investigation, State Farm sent Dr. Swanson a letter asking him, among other things, to apportion Plaintiff's injuries and treatment (including the need for the right knee replacement surgery) between her pre-existing conditions and any conditions causally related to the accident.

17.     On November 1, 2006, Dr. Swanson wrote a letter back to State Farm in which he apportioned 50% of the injuries and treatment to Plaintiff's pre-existing osteoarthritis and 50% to the accident.

18.     Without any change in Plaintiff's physical condition, symptoms, or medical records, on November 16, 2006, Dr. Swanson wrote a subsequent letter to State Farm indicating that he was "mistaken" about his prior apportionment opinion and, as a result, needed to change that opinion to 80% related to the accident and 20% related to the pre-existing degenerative condition.

19.     On the same day that Dr. Swanson authored the November 16, 2006 letter, Dr. Swanson discussed the need to change the opinion with Plaintiff's lawyer and son, Ralph Schwartz, and,

5

1  in fact, Dr. Swanson prepared the November 16, 2005 letter shortly after the discussion with Attorney Schwartz.

20.  The basis for Dr. Swanson changing his apportionment opinion was due to Dr. Swanson's discussions with Attorney Schwartz, not because there had been some change in Plaintiff's conditions, symptoms, or medical records.

21.  In light of Dr. Swanson's conflicting opinions, State Farm decided to conduct its own medical evaluation of the Plaintiff, consistent with the terms and conditions of the policy. As such, on December 13, 2006, State Farm requested Plaintiff to undergo an independent medical examination ("IME").

22.  In response to the request for an IME, Plaintiff filed the present lawsuit against State Farm on December 19, 2006.

23.  The Policy includes a condition, which obligates the Plaintiff to "be examined by physicians chosen and paid by us as often as we reasonably may require," (the "IME Condition"). The Policy also includes a condition stating that "there is no right of action against [State Farm] until all terms of the policy have been satisfied."

24.  Through discovery, and after Defendant assumed the cost of defending the lawsuit, Plaintiff ultimately submitted to an IME with Dr. Steven Sanders, a board certified orthopedic surgeon.

25.  In connection with this IME, Dr. Sanders reviewed the known entirety of Plaintiff's medical history as it related to her knee problems, including medical records that pre-dated the July 28, 2005 accident. Dr. Sanders also took Mrs. Schwartz's history and conducted a physical examination.

26.  As a result of his IME, Dr. Sanders concluded, to a reasonable degree of medical probability, that Jeanette Schwartz sustained soft tissue muscular strain injuries to her entire spine, which were 100% accident related. As for the need for right knee replacement surgery, Dr. Sanders opined, to a reasonable degree of medical probability, that it was solely related to her underlying degenerative arthritis condition, thereby apportioning 0% of the need for surgery to the subject accident.

Likewise, by finding that the right knee surgery was not related to the accident, any complications stemming from that surgery, i.e., the right peroneal nerve palsy, was 0% related to the accident.

27. Plaintiff's treating physician's, Dr. Swanson's, testimony regarding apportionment was equivocal. First, it was 50/50. Then, fourteen days later, Dr. Swanson changed his apportionment opinion to 80/20. Then, when deposed in connection with the litigation, he was unable to testify to a reasonable degree of medical probability regarding any apportionment percentage. Then, at trial, Dr. Swanson gave yet another apportionment opinion, a "range" between 50-80 percent of the need for the surgery apportioned to the accident. In light of Dr. Swanson's equivocation, Defendant's request for an IME was reasonable. Plaintiff's filing of suit was reasonably interpreted by Defendant as a refusal by Plaintiff to submit to the requested IME. The deposition testimony of the claims adjuster, a non-attorney, in response to a question from counsel for Plaintiff, that Plaintiff had not violated the terms of the policy of insurance, is not binding on Defendant because she was not authorized to render a legal opinion on the matter. Counsel for Defendant properly preserved his objection to the deposition question as "calling for a legal conclusion".

28. The Plaintiff's knee x-rays, which were taken before and after the accident, show effectively no anatomical difference or change. In other words, the Plaintiff's condition before the accident was that she had, effectively, progressively degenerating bone-on-bone arthritis. This condition, however, was not caused by the accident.

29. Plaintiff did, in fact, sustain some injuries as a result of the subject accident, e.g., soft tissue muscular sprains/strains along her entire spine and headaches, which have since resolved.

30. Plaintiff is not making a claim for past lost earnings, a loss of future earnings, or a loss of future earnings capacity.

31. On February 28, 2007, State Farm paid the amount of its initial UIM offer, $125,000 to Plaintiff.

32. For purposes of calculating any applicable offsets, Plaintiff has already recovered, and can keep, a total of $140,000 for the injuries and treatment she sustained as a result of the July 28, 2006 automobile accident, and State Farm would be entitled to an offset in that amount.

## II.     CONCLUSIONS OF LAW

1. In part, this claim involves a UIM contract value dispute. In order to recover under her UIM policy, Plaintiff must establish "legal entitlement" to such benefits. "Legal entitlement" is defined as: (1) fault on behalf of the underinsured motorist, and (2) the extent of her damages. *See Pemberton v. Farmers Ins. Exch.*, 109 Nev. 789, 796, 858 P.2d 380, 384 (Nev. 1993). With respect to the first prong of the *Pemberton* test, it is clear that the accident was caused by another driver, and not Plaintiff. Therefore, Plaintiff has established the first prong of the *Pemberton* test.

2. However, satisfaction of the first prong alone is insufficient to establish legal entitlement to UIM proceeds. *Id.* Specifically, Plaintiff must still prove that her damages resulting from the accident exceed the value of what she has already recovered, i.e., $140,000. The presentation of the evidence, however, shows that Plaintiff cannot satisfy this second prong.

3. The evidence shows that Plaintiff experienced significant, symptomatic "bone-on-bone" or "near bone-on-bone" arthritis in her right knee well before the accident. The distinction is not medically significant. The evidence also shows that even Dr. Swanson considered Plaintiff as a candidate for a total right knee replacement surgery well before the subject accident, and that the cortisone injections were merely an unsuccessful attempt to stave-off the inevitable, a right knee replacement. Indeed, the medical records of April 28, 2005, establish that Plaintiff was still limping and experiencing pain while bending her right knee before the accident. Moreover, taking the entirety of Dr. Swanson's testimony, it is clear that Dr. Swanson is unable to testify to a reasonable degree of medical probability regarding what percentage of Plaintiff's right knee surgery should be allocated/apportioned to the subject accident versus her pre-existing conditions.

4. In a case where a plaintiff has a pre-existing condition, and later sustains an injury to that area, the Plaintiff bears the burden of apportioning the injuries, treatment and damages between the pre-existing condition and the subsequent accident. *Kleitz v. Raskin,* 103 Nev. 325, 327, 738 P.2d 508 (Nev. 1987), citing *Restatement (Second) of Torts* §433(B), and relying on *Phennah v. Whalen*, 621 P.2d 1304, 1309 (Wash. Ct. App. 1980)(stating that the burden to allocate should not be shifted to the defendants where the situation involves the allocation of damages between a plaintiff with a previous

injury and a single, subsequent tortfeasor). Dr. Swanson's apportionment opinion was, at best, equivocal regarding what percentage of the need for surgery was pre-existing and what percentage was caused by the accident. Such an equivocal opinion is insufficient under Nevada law to overcome one's burden of proof on medical causation. *Morsicato v. Sav-On Drug Stores, Inc.*, 121 Nev. 153, 157-58, 111 P. 3d. 1112 (Nev. 2005)(holding that expert testimony regarding causation must also rise to this level of certainty, i.e., a reasonable degree of medical probability). Noting that Dr. Swanson's testimony cannot satisfy Plaintiff's burden under Nevada law, particularly in light of his latest opinion, a "30% apportionment range," this Court must find that the surgery and subsequent complications were not caused by the accident, and cannot be awarded as damages in this case. On the other hand, Dr. Sanders' apportionment opinion is clear and unequivocal and consistent with the *Morsicato* standard: 0% of the need for the right knee replacement and 0% of the subsequent surgical complications (e.g., peroneal nerve palsy) are related to the subject accident.

   5. Because Plaintiff has failed to satisfy her burden of linking/apportioning the need for a right knee surgery and the subsequent post-surgical complication of the peroneal nerve palsy to the subject automobile accident, this Court, then, concludes that Plaintiff only sustained soft tissue injuries to her entire spine and headaches as a result of the subject accident which have resolved, and that $6,829.60[2] in medical specials were reasonable, necessary and related to those problems/conditions.

   6. In light of the offsets available to State Farm, this Court concludes that Plaintiff is not entitled to any additional recovery beyond the $140,000 that Plaintiff has already received. Therefore, State Farm is not obligated to pay any additional sums under the UIM policy.

   7. In the alternative, the Court also finds that the Plaintiff's failure to submit to an IME as requested by State Farm violates certain conditions of coverage under the policy, the "IME Provision" and the "Suit Against Us Provision." Nevada law clearly enforces coverage conditions, and precludes coverage irrespective of whether there is any prejudice to the carrier. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Casinelli*, 67 Nev. 227, 216 P.2d 606 (Nev. 1950)*; Las Vegas Star Taxi, Inc. v. St.*

---

[2] Dr. Thorp = $4,810.10; Desert Radiology = $314.00; Desert Orthopedic (Dr. Swanson) = $400.00; Nevada Imaging (Knee MRI) = $1,305.50

*Paul Fire & Marine Ins. Co.*, 102 Nev. 11, 714 P.2d 562 (Nev. 1986); *S.B. Corp. v. Hartford Accident and Indem. Co.*, 880 F. Supp. 751 (1995), *aff'd* 100 F.3d 964 (9th Cir. 1996)(unpublished decision). However, in this case, there was prejudice to the insurer who was required to engage the services of attorneys to respond to the lawsuit.  Thus, it was denied its contractual right to complete its investigation and attempt to settle the lawsuit before incurring legal fees.

        8.      Moreover, the Court concludes that Nevada, like other jurisdictions, would more specifically hold that an insured's failure to submit to an IME qualifies as a breach of the insurance contract, and precludes Plaintiff from recovering under the policy, and that even though Plaintiff subsequently underwent the IME, her failure to submit to an IME when initially requested still qualified as a violation of coverage in light of the "Suit Against Us Provision." *See, e.g., Williamson v. State Farm*, 2004 WL 1178351 (Ohio. Ct. App. 2004); *Van Haaren v. State Farm Mut. Auto. Ins. Co.*, 989 F.2d 1, 6 (1st Cir. 1993) (although Ohio requires a showing of prejudice to the insurance company before the refusal to submit to IME qualifies as a breach); *Hansen v. State Farm Mut. Auto. Ins. Co.*, 936 P.2d 584, 589 (Colo. Ct. App. 1996) *rev'd on other grounds* 957 P.2d 1380 (Colo. 1998); *Falagian v. Leader Nat'l Ins. Co.*, 307 S.E.2d 698, 700 (Ga. Ct. App. 1983)(finding refusal to comply where insurer had scheduled an IME, which the insurer cancelled when the insured's counsel promised the insurer he would reschedule the IME but instead filed suit).

        9.      Plaintiff's unjustified refusal to submit to the reasonable request for an  IME, coupled by an immediate filing of a lawsuit, therefore, precludes her from recovering under the policy. Thus, even if Plaintiff were able to establish a claim that had a UIM value beyond what she has already received, which she has not, State Farm would not be obligated to tender any additional sums because Plaintiff violated the IME condition.

**III.**      **CONCLUSION**

This Court hereby finds, based upon the evidence presented, that Plaintiff is not entitled to any additional benefits under the UIM policy; and even if she were, her violation of the IME condition and the Suit Against Us provisions of the policy precludes her from obtaining any further recovery against State Farm.

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court enter **JUDGMENT** for Defendant and against Plaintiff.

DATED this 22nd day of July 2009.

_____
Kent J. Dawson
United States District Judge